Good morning to all of you. My name is Dale Galipo and I'm representing the appellant who's the mother of the decedent. And I'd like to reserve maybe three minutes if that's okay. I know we always try to watch your clock but we'll try to yes I know it never quite works out. But our position in short is that the plaintiff's facts as true and take all reasonable inferences of those facts. And if they would have, there would be tribal issues of fact with respect to the constitutional claims and the state law claims. And then the second part is assuming what facts this court adopts, we think with respect to qualified immunity, the law was sufficiently established at the time. So the fact that I struggled most with was whether this stick was sharp. Can you help me with whether there was any evidence submitted by plaintiffs that the stick was not sharp? Well yes. So there were two estimates. First of all, no one described the stick as sharp except one of the officers. Jackson did. Correct. Actually it might have been Thomas. Let me see. I think Jackson said that he didn't know if it was sharpened down. I think it's just the other way around but we could be wrong. Either way. I could be wrong also. I'm looking at my notes. One of the officers thought he described it in a certain way as a sharpened down. That was the implication. The other officer said he didn't see it as sharpened down. And none of the plaintiff's witnesses saw it as sharpened down. Were they asked? So what I'm trying to figure out is it seems like the only testimony I could find was that the stick was sharpened down. And I didn't see anyone else saying I saw the stick and it was not sharpened down. And I didn't see that many people being asked. I mean it seems like you took depositions of people who were there and didn't ask about whether the stick was sharp. I don't know if it was you but someone took those depositions. I think actually it was me. So I could take the blame for it if the question wasn't asked. But I'm not so sure explicitly that was asked. I think you're correct in that regard, Judge Freeland. But I can tell you that I believe from the record there's at a minimum a factual dispute. The reason it's important is. What creates the factual dispute if the only testimony is that it was sharp? Because I believe, if I have it right, the officer who shot first. And we believe both volleys of shots have to be looked at independently. But the officer who shot first did not see it as sharpened down. I think that is critical. Well, now maybe we do need to sort out which one. Isn't Jackson the one who shot first? That is correct. And I think it's Jackson who said it was sharpened down. So let me see. Can you tell us where that is? Sure. I'm trying to find that right now. I think that's in the excerpts of record page 248. And who was it, though? Jackson. Okay. So Jackson was the one who actually thought it was sharp. No. According to this, if this is correct, he didn't know whether it was sharpened down. Okay. So let's assume that's correct. Let me ask you this. Both the officers, weren't they in the best position, other than the decedent, to be able to determine whether or not it was sharp? Probably yes. And if the officer who initiated the shooting did not see it as sharpened down, I think that's a very important fact. Beyond that, which we think is very important, is that the evidence is, at least if you take it in our light, he didn't swing the stick at anyone prior to approaching the bleachers or in the bleachers. He went directly around the woman with her child, and we are sensitive to that, and to the top of the bleachers, turned around and was shot without making any threatening movement at all. Two witnesses said that. Now, I understand the officers are trying to say, well, we felt he made a threatening movement, and one of the officers conceded, based on his training, whatever he was holding, however you want to describe it, they could not shoot without a threatening movement. From our perspective, he wasn't close enough to strike her. Ms. Viob said he tried to climb over the bleachers, he turned around, he was just standing there, he was stationary, he was shot. He didn't do anything with the stick. But she did say that she feared, and she said that the reason why she felt comfortable was because she knew that the police officers were there. And she covered her son, and the officers, I don't know that you have any evidence that they didn't see that. They were, it seemed to me, they were concerned about that. There's no question, Judge Silver, and rightfully so, that there was a concern, a general concern for safety. And I could understand that completely. But from our perspective, it doesn't rise to killing someone. This young man was, they thought he might be mentally ill, which he was. He was eyesight impaired. No, they thought he was, he may be intoxicated. It was later determined, I think by the mother, that she said that he was perhaps mentally disabled. Well, excerpts of record 203, 244, and 245, Jackson considered the possibility that he was mentally ill. But I agree with you, sometimes it was one or the other and or both. I get it. But what we're saying is not that the officers or the public didn't have a reason to be concerned. A lot of issues arise to a concern for safety in general. It doesn't rise to killing someone.  So you started with, which is so critical at the district court level and certainly more at the court of appeals when we look at the record, why don't you tell us what are all the undisputed admissible facts that would establish not only excessive force, but that would establish that there was, and we'll get to the law, on whether there was a clearly established right. Yes, I'd be happy to do that. So I would start with the first, because in reviewing everything that I could review, there was a substantial disagreement between you and counsel as to what the admissible facts were. I think there are, but let me go through them and I'll tell you what's disputed and what's... I mean, from your perspective, so that we can determine whether or not this matter should go to trial, it's essentially whether at the end of your case this court would grant a Rule 50. So you need to give us the perspective of what is undisputed admissible evidence, not credibility, admissible evidence. Sure. I'm happy to do it. First of all, they were not responding to serious crime. They had no information. He had injured anyone, had threatened to injure anyone. But isn't the really critical issue whether he was an immediate threat? I mean, all those other things are secondary factors. So I think we need to focus on that moment when he was potentially threatening the mother and kid. Yes, it is. But if you just give me 30 seconds, I think what leads up to that is also important. Because under the totality of the circumstances, he didn't swing this stick at anyone. In fact, they were swinging sticks at him, the soccer dads. Now, if we're going to say swinging a stick at someone is deadly force so that you can kill someone, then I know it's silly, but some can argue, are we going to start shooting the soccer dads for swinging a stick at him? So I found the sharpened down testimony. It is Jackson. It's at SER 18. So I'm not sure how you can make the argument that the officer who was shot first isn't the one who said it was a sharpened down stick. Okay. You're looking at an entry that says he thought it was sharpened down? Okay. And I apologize, and I have that backwards. And he's the one that shot first. Okay. Okay. So let me continue, because I do agree with you, the ultimate things. So he gets into the bleachers. He runs right by a miscombronen or child that are on the second level. He goes to the top. It appears he's trying to climb over. He turns around. He's stationary. There's no threatening movement, and he's shot. That's our facts that I believe you have to assume as true, because can you find a witness that counters another witness? Yes, but for purposes of summary judgment, you have to assume our facts. He's stationary during all the shots, doesn't swing it, doesn't make any type of motion with it, is just standing there. Who is the witness who says that is what happened? Ms. Viab. Multiple entries in the record by her. She goes, he goes, her words, I'm paraphrasing, he goes to the top of the bleachers. It looks like he was going to try to climb over. He turns around, and he's shot. He was just standing there. He didn't do anything with the stick. Okay. What about Ms. Martinez, who ran, and what did she say concerning the threat or concern about the woman who was sitting there? She ran away, but the woman who was sitting there had a child that she had to cover. Yes, I will address that, but again, I want to emphasize that. But isn't that part of the admissible facts here? That's undisputed. But we can't weigh evidence. No, but in terms of whether or not you're entitled to a jury finding, in other words, and that there is enough for excessive force, we have to take everything that is undisputed, don't we? No, what we have to do is take all of the plaintiff's facts, whether they're disputed or not, in plaintiff's favor, and then say, is there enough for the jury to decide? No, they have to be, I agree, they have to be admissible. Admissible facts. And then, but don't we take in context the entire situation? We don't overlook what, at this point, what the defendant would offer. Well, here's the thing. No, I think, no, I don't think we can consider that for purposes of summary judgment. I think Judge Freeland is correct. We have to look at that. If there was an immediate threat of death or serious bodily injury, then that's the issue in the case. But excuse me, but this is what is disturbing me. This is a very tragic case. Yes. And it may well be that the decedent did not pose a threat, that one could say after hearing everything, there was no threat. But the question for us, I think, is what, for purposes of immunity, at least, is what would be apparent to a reasonable officer on the scene. Okay. Thank you. So that is what is troubling me. Thank you, Judge Schroeder. So let me address that. Because even if this Court decides qualified immunity should apply, and I don't think it should, we would ask this Court to reinstate the State claims. Because qualified immunity does not apply to the battery negligence in Bain Act. So we have to decide, because the State claims are, we do not have to decide under the State claims whether or not there was a clearly established right. Right. So we have to look at excessive force and whether or not. Correct. The first issue is whether or not there's facts. We think there's clearly facts, not that you would necessarily decide, if you were trying the case, that it was excessive force, but there's facts from which a jury, if they believe them, could find that. And I want to go to Judge Schroeder's question. And Martinez, just so you know, she said he was just standing there, not advancing. In her statement, he made no movement at all. In her depositions, she said he lowered it two inches. She didn't say that in her statement, but she said he was just standing there, not close enough, lowered it two inches. And that's why we pointed out, and this may go in part to Judge Schroeder's question, that's why we pointed out the Munoz v. City of Union City case, a 2004 case that talked about lowering the knife six inches from five or ten feet away wasn't enough, was not enough. In other words, that could be a violation of excessive force. So I would say this. First, the general cases saying that if there's disputed issues of fact, you shouldn't grant qualified immunity. Second, the various cases we have in this circuit where there's knives and guns in hand. If that was the end of the analysis, then any time someone had a gun or knife in their hand, it would be the end of the analysis. But we cited numerous cases. Let me ask you a question, though. The first, there's two parts. The first part is excessive force. The second part is whether there was a clearly, are you saying, clearly established right. Are you saying that there are issues of fact on that that would have to go to the jury as a matter of interrogatories of some sort? Yes, I am. Yes, I am. Because qualified immunity, if you want to talk about it in this abstract, and I wonder, I know now people are looking at the second prong. I get it. But it always comes back to on what facts. If you're saying that he went to the top of the bleachers, turned around, made no threatening movement, there were no commands or warning with him on the bleachers, he wasn't close enough to strike this woman who was three or four levels down, and they shot him, someone could say that falls within the obvious. It certainly, if you look at the knife and gun cases where they're not pointing the gun at the person or they're not charging or attacking, we believe that would cover it. Even the officer's own testimony, his training was, if there's not a threatening movement, we can't shoot. So if the key is to put the officers on notice as to whether it would be appropriate or not. I'm sorry. I need to interrupt you because you're already over your time, and I think you wanted some time for rebuttal, so I'll give you one minute for rebuttal later, but you better sit down now, please. Okay. Thank you. Thank you. Thank you all. Good morning, and may it please the Court. My name is Daniel Cha, Senior Deputy City Attorney, attorney for the Pelley's City of Huntington Beach, Trevor Jackson and Casey Thomas. I'd like to start by re-grounding the discussion in the Supreme Court's statement of the test. Could we start, though, with the stick? So why is there no picture of the stick? I'm not sure why there's no picture of the stick. We had a description from Officer Jackson describing it as a sharpened-down stick, similar to the type of stick that would be used in a booby trap in Vietnam, that kind of a stick that I think is inherently dangerous. But the officers shot someone. Why was there no documentation of the reason that included a picture of the stick or the stick itself? Well, I think Officer Jackson's description was complete and provocative. Well, it's not that complete. He said it was 18 inches to 2 feet. Other people say it was like 6 inches or the size of a bottle. It's not clear what this stick looked like, and it seems like that may be a key fact about whether it was reasonable for the officers to be concerned. So I just don't understand how we end up with a record that has no, I mean, has very thin evidence about a key piece of information. I don't know what the weapon is. Well, I think the only dispute to the description of the stick was the length. I believe that we have the description in the record from Officer Jackson. Even Casey Thomas, right before he shot, he saw it, and he saw it was a sharp stick. Wait, where is that? Because we were just finding the Jackson testimony. Where is it that Thomas says that? Yeah, we didn't see that. One moment. I believe it's at Excerpts of Record 283 through 284. It's Thomas' testimony that he saw the sharp stick. Still in his hand, in between the first and second shot. So they both, are you saying both of them saw a sharp stick? Sharp stick. He says it's a piece of wood, a piece of wood or stick. Where does he say it's sharp? I believe it's between line 17 and line 1 of the next page. Well, so I can read it to you. Okay, at some point, could you see something in the decedent's hands? Yes. And at some point, did you recognize it as a piece of wood or stick? Yes. And when did you first recognize it as a piece of wood or stick? After Officer Jackson had originally fired his shots. Would it be fair to say you weren't sure what was in his hand before the first group of shots? That would be fair to say. But when you got closer, were you able to tell what it was? Yes. Right. And we do have Officer Jackson's testimony as to this. Well, that's the point, though. And then others also described it as a sharp stick. You need to tell us, because I don't know of any other testimony about that. If there is, it would be really helpful to know. Well, I do know that there were descriptions from Martinez saying he was chasing the children on the soccer field with a stick over his head. And even the witness that planned for Laison Villalbe says that he was holding the stick in a threatening manner, and she felt that it was a threat even to her. And I think, again, we have to look at the whole totality of the circumstances. And so we have people responding to Mr. Schiltz's rampage across these soccer fields in a manner showing that they perceived him as a danger. Adults were throwing children outside of the soccer field. But that is also really confusing, because they weren't really. I mean, if people were really worried about him, it seems like they would have run away. Instead, they waved branches at him. Well, I would say the people who were waving the branches at him were the adults on the youth soccer field. And so some of the adults were literally throwing their kids over the fence, whereas others were trying to stop this man who was chasing after these young children. And so I think they were doing what any parent hopes never has to occur, the choice that they have to make. And some of them tried to stop this man. Others tried to basically throw the children over the chimney fence to get them away from him. So if we end up with, I think, where we are now, that Jackson was the only one who said it was a sharp stick. Yes. Then that would be very helpful, I suppose, on this issue if it was sharp. But if he only says that, if the other evidence that has been offered to establish perhaps a credibility issue as to whether or not he's telling the truth, as plaintiff's counsel has said, doesn't that make it clear that it's an issue of fact as to whether or not it was sharp? In other words, he could be cross-examined. For example, as you already pointed out, in contrast to others, he said it was a lot longer, which would, of course, make it more dangerous. Well, the appellant didn't place any evidence into the record that would contest the fact that it was sharp. And so, again, the issue here is, and again, if you take the actions of everybody else at the scene on its face value and the reasonable inferences from them, their perception of the threat, Ms. Martinez screaming out in panic, he's running after our boys, somebody please call 911, and for her to jump off of the bleachers when he starts to approach because she saw him as a threat, it wasn't because he was just holding a chopstick or a drumstick. It was something that was dangerous that he was doing. So should we treat this as a situation where the officers destroyed the evidence and have a presumption against them about what the stick was like? Because it's kind of unfathomable that they killed someone because he was holding the stick and threatening people and then didn't take pictures of it or save it. Is there some way that that should be against the officers here? Absolutely not, because the police department didn't conduct the investigation. Whenever there's an officer-involved shooting, the investigation is conducted by the Orange County Sheriff's Department. We have an independent third party come in. Is that in the record? I don't remember that. Is that in the record? I'm not sure if it's in the record, but there was no mention from appellants below that there was any sort of destroying of evidence or anything like that. Do we have pictures from that investigation? I mean, they must have taken pictures of this stick, right? I do believe there are pictures. I don't know why they weren't entered into the record below. So is it possible to get them? I mean, why isn't that in the record? Well, that's a question that's directed not just to the appellees, but also to the appellants. But I think obviously you would know. I don't think it was discussed really in the district court opinion. So it seems to me that... I believe Judge Guilford below did mention that it was curious that there was no picture of the stick. But the only direct evidence of the nature of the stick was Officer Jackson's description of it. But again, if you take the circumstantial evidence of how everybody else responded to this man running across the fields, chasing after the children, that just confirms Officer Jackson's description of it as a dangerous object. Okay. And that's your point, is even if it wasn't as a sharpened stick, it was a dangerous object of some sort because of the reaction of everybody. Yes. And again, that's why I wanted to start with bringing it back to the standard that's been set by the Supreme Court. It's an examination of the totality of the circumstances. Well, we don't judge what the police do by how non-police react to a situation. Sure. But it's evidence of the reasonableness of their perception of the danger that was presented by this man. And that's consistent with every single independent witness. Everybody saw this man as a threat, including Ms. Vialb, who said she felt relief when the officers opened fire on him because of the threat that she perceived from him. And what other thing was he doing other than carrying this sharp stick, running at these young children, and eventually running towards these bleachers where Ms. Cambron is huddled over her child, her 6-year-old, and she believes something's going to happen because she does what a mother does, and she throws her body over him. But it is always the reasonable perception of the police officers. Correct. So what you're saying, maybe support what they saw, but is there any reason to believe that they were there and saw the danger? Well, you have their direct testimony, and I think the whole point of looking at what everybody else says is to test the reasonableness of their direct testimony. And nothing that was elicited below changes the ultimate conclusion on the record that they reasonably perceived that Mr. Schiltz was an imminent threat of great bodily harm. If we take the facts in the light most favorable to plaintiff, even if we assume the stick is sharp for now, the other testimony would have him a distance away from the mother and kid, a distance away from the officers, and only holding something that you could hurt someone with if you were closer to them. And that seems very similar to the SB case where our court held there was fact to support a violation but not qualified immunity. So why do we not have a situation here where SB tells us this is a violation? Okay. One thing I would like to say is there was an impression made that he ran all the way up to the top of the bleachers. I don't care if he was at the top of the bleachers. I'm saying at the moment he was shot, he was a distance, according to the evidence in the light most favorable to plaintiff, there was a distance by which he could not have hit anyone with the stick. And he was kneeling, it seems like. Well, that's an unreasonable inference, because if you look at SCR 97, 99, and 101, you see the pictures of the bleachers. These aren't the student section at the Rose Bowl. These are small, portable bleachers. Yeah, but you could be a distance away that you couldn't hit someone without moving more on those bleachers. There was direct testimony that he was in from an independent witness saying that he was within striking distance. But there are other people who said he wasn't. I mean, it doesn't – in the light most favorable to them, he was at least six feet away. I understand, but he also had the upper ground. But how do you hit someone with a stick from six feet away? Six feet is very close. If he is about six feet tall and he lunges at someone from a higher distance, that's clearly within striking distance. But there's at least some testimony that he was even down. He was either kneeling or sitting. So, I mean, he needed to take some more movements, which is really similar to what the situation was in SB, where the person has a knife, a dangerous knife, definitely a knife, not just a question about a stick, but a knife, and is kneeling down. And our court said it's a violation to shoot him because he's too far away to hurt anyone. Well, I think SB says the big problem with SB in terms of the excessive force inquiry was the fact that two of the three officers testified that the officer who shot couldn't see them and their location. So that was the more significant factor in that determination. If you look at, and also if you look at pages 1011 and 1012 of that opinion, the individual in SB, he complied with multiple orders that were given to him. And so there was no erratic or dangerous behavior that he showed before he made that movement. And so, again, we look at the totality of the circumstances and his demonstrated dangerous behavior, threatening young children across the soccer field and coming up on this bleacher with this young woman and her small child, and she perceived him as a threat as well. Is there a distinction, remind me, in the SB case, that whether or not there was some evidence that the defendant or the decedent there was actually challenging or potentially hurting third parties and as opposed to the police officers? No, Your Honor. I believe that in SB, the only information the officers had was that he was mentally disturbed. But, okay, so he was mentally disturbed, but were they concerned for themselves because of the knives in his pocket, or was there someone else there, as we have in this case, where the officers would have to be concerned about third persons? No, there was no innocent bystander in the vicinity. And, again, there was a dispute as to whether the shooter in that case could even see his fellow officers and could see how far they were away from the person with the knife. So I think that's very significant. And also, with regards to the extent that SB has a bearing on qualified immunity, that opinion was filed on May 12, 2017, and our incident took place in March of 2017. So at the very least, SB is no barrier to qualified immunity for our officers. What's your best case? Our best case, I believe it's Blanford, because, again, in that case, that gentleman refused several orders to stop and to drop his weapon. But he had a huge sword, right? Is that the case with the huge sword? Yes, but there was nobody else in the area. It was just the fact that he might be going into a house. And the officers, because when the officers tell him to stop and he does not stop, he does not drop the weapon, that conduct in and of itself is communicative of a threat that he's going to use the weapon. But you're asking us to assume that this is a weapon that was perceived to be a weapon. No, we don't need to assume. We have direct testimony from Officer Jackson, uncontested, unrebutted. Appellant had the opportunity to put that picture into evidence if he believed that the stick, the picture of the stick was any less, showed that it was any less dangerous than Officer Jackson's evocative testimony that it was a punji-style stick. And so once we placed Officer Jackson's testimony into the record, the burden shifted to the plaintiff to come back with other evidence from which the court could determine that there's a dispute as to the dangerousness of the stick. Does the record establish how far away or how close Jackson was when he made that perception, compared to others who might have been close or closer? Well, initially they were pretty close because Officer Jackson came upon him and asked him to come closer and to talk to him about what was going on, and then he jumps over the soccer field arena and then Officer Jackson is chasing him throughout the soccer fields. At certain points he's 50 feet away, but then he's getting closer. By the time he gets to the bleachers, he's about 15 feet away. So is it your position that he was in the best position to determine what the stick looked like? Yes, it was. And, I mean, there's no one else that could contest that who would have a better position, perception of it? Yes, and no one did. And I believe my time's up, and we'll submit. Thank you, counsel. We'll give you a minute for rebuttal. I know I'm very limited, but I want to make a few comments. Ms. Cabrone saw the stick as he was approaching the bleachers and went by him in her own testimony on Excerpt of Record 207-325-326. She did not feel like she could be seriously injured by that stick. Well, she didn't say that stick. I mean, she said she didn't feel like she could be seriously injured, but then she said she felt she qualified that by saying, I felt safe because the police officers were there. And I think at another point she said she feared for the safety of herself and her kids. So there was kind of a mixed testimony. But that doesn't mean it's okay to kill someone. That's the distinction we're trying to make. And as it's been pointed out by Judge Freeland and to some extent by Judge Schroeder, if he went to the top of the bleachers, turned around, not close enough to strike, that's our facts, no threatening movement. It clearly supports evidence of a constitutional violation and state battery claims, but from our position it also supports not granting qualified immunity, especially with the second group of shots. Officer Thomas says there's 10 or 15 seconds between the first group of shots where he could tell he was struck, injured, bleeding, seated, down. And they both fired fatal shots. 10 to 15 seconds after the first volley of shots, one in the forehead and one in the chest. And that's in part why we cited the Zeon case. And that's why I said I think those two groups of shots, because if you have someone who's already shot, sitting at the top of the bleachers, literally bleeding to death, not close enough to do anything, and then you're just going to kill them by shooting them in the head and the chest, I think a jury could find that's clearly excessive. And I would say, although I agree there's no specific case, I think the closest one Judge Freeland pointed to, and we agree with that, that supports why this court should at a minimum send this back down on the state law claims, I think the closer call is qualified immunity. But I would say this, if he made no threatening movement and wasn't close enough and was holding a stick, do we really need a case to tell us that that would be inappropriate? When the officer himself says, I admit based on my training, that would have been inappropriate? Let me ask you just one question. Do you agree in the SB case and in this case, in the SB case, the officers feared for their lives as opposed to a third party, which we have in this case with the mother who is protecting her son? Technically, yes, but I would say it doesn't make a difference in terms of the analysis for constitutional purposes. Because if there's no immediate threat of death or serious bodily injury, whether it's to the officer or someone else, you can't shoot him. Thank you, counsel. Thank you both sides for the helpful arguments. The case is submitted.
judges: Schroeder, Friedland, Silver